UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JASON ZUHL,

        Plaintiff,

                           Case No. 1:12-CV-1380

v.

                           Hon. Hugh W. Brenneman, Jr.

COUNTY OF BERRIEN, et al,

        Defendants.

_____/

**OPINION**

Jason Zuhl ("Plaintiff") filed a four-count complaint against Berrien County and certain individuals alleging various violations of his Fourth Amendment rights. Counts II, III, and IV, and all defendants other than Deputy Jason Haskins, have been dismissed from the case in an Order dated June 18, 2014 (docket no. 38). The Court now reviews defendant's motion for summary judgment (docket no. 29) on the remaining count (Count I), which pertains solely to Deputy Haskins ("Defendant"). Count I is a Fourth Amendment claim of Excessive Force and Unreasonable Search and Seizure brought pursuant to 42 U.S.C. § 1983. Plaintiff alleges that Deputy Haskins used excessive force and conducted an unreasonable search and seizure when he entered plaintiff's home while executing a search warrant, and allegedly struck plaintiff in the eye with a flashlight. Plaintiff opposes the motion.

**I.      Legal Standard**

42 U.S.C. § 1983 confers a private federal right of action against any person who, acting under color of state law, deprives an individual of any right, privilege, or immunity secured by the Constitution or federal laws. *Burnett v. Grattan*, 468 U.S. 42, 45 n.2 (1984); *Stack v.*

*Killian*, 96 F.3d 159, 161 (6th Cir.1996).  To state a § 1983 claim, a plaintiff must allege two elements: (1) a deprivation of rights secured by the Constitution and laws of the United States, and (2) the defendant deprived him of this federal right under color of law.  *Jones v. Duncan*, 840 F.2d 359, 360-61 (6th Cir. 1988); 42 U.S.C. § 1983.  "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  Rule 56 further provides that "[a] party asserting that a fact cannot be or is genuinely disputed must support the assertion by":

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or

> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1).

In *Copeland v. Machulis*, the court set forth the parties' burden of proof in deciding a motion for summary judgment:

> The moving party bears the initial burden of establishing an absence of evidence to support the nonmoving party's case.  Once the moving party has met its burden of production, the nonmoving party cannot rest on its pleadings, but must present significant probative evidence in support of the complaint to defeat the motion for summary judgment. The mere existence of a scintilla of evidence to support plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff.

*Copeland*, 57 F.3d 476, 478-79 (6th Cir. 1995) (citations omitted).  "In deciding a motion for summary judgment, the court views the factual evidence and draws all reasonable inferences in favor of the nonmoving party."  *McLean v. 988011 Ontario Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000).  The proper inquiry is whether the evidence is such that a reasonable jury could return a verdict for

2

plaintiff.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see generally Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1476-80 (6th Cir. 1989).

## II.    Background

This action arises from plaintiff's allegation of excessive use of force by a law enforcement officer during the execution of a search warrant.  At approximately 6:00 a.m. on January 29, 2010, Berrien County sheriff deputies assigned to the Narcotics Unit, together with officers from local police departments, executed a lawfully authorized search warrant at the residence of plaintiff and his wife, Anne Mathis Zuhl, in Stevensville, MI.  Docket no. 1, Plt. Compl., PgID# 4. Upon arrival, officers stated they knocked on plaintiff's door and announced their presence.  Docket no. 30, Def. Brief, PgID#139.  Plaintiff, who was in his living room while waiting for his ride to work, said he looked out the window and saw four men in dark clothes. Despite their marked clothing, plaintiff contends he did not recognize the men as police officers but thought they were his wife's acquaintances from work.  Angry with his wife, he turned around and walked towards the bedroom where she was sleeping. *Id.* at PgID#140.  Through the glass in the door, the officers observed plaintiff "turn around and either walk quickly or run away from the door toward the inner portion of the apartment and disappear . . . around a wall."  Docket no. 30, Def. Brief, PgID#139.  Using a ram, the officers gained entry into the residence through the front door.  Hearing a loud noise, plaintiff turned around towards the front door.  The police announced "search warrant" upon entering, which plaintiff admits he heard twice prior to any contact between the parties. Docket no. 33-2, Plt. Dep. Trans., PgID# 306, pg. 79, line 24; *id.* at pg. 80, line 14.

The details of what happened next are disputed by the parties.  Plaintiff, when deposed, stated that "it all happened extremely quick" and that when he "came around that corner

[he] was in shock or awe."  He stated was moving backwards (*id.* at pg. 78, lines 3, 10-11) when he was hit in the face (*Id.* at 307, pg. 83, line17) with what he asserted was a Maglite-like flashlight. Plaintiff testified it was a "Maglite" flashlight because it has a "very distinct sound."  *Id.* at PgID#305-06, pg. 76, lines 24-25; *id.* at pg. 77, lines 1-2.  Plaintiff stated he was not sure who hit him but thought it was the lead officer.[1]  *Id.*  Plaintiff was asked if he fell backwards after being struck and he responded "yes." He was then asked if he lost his balance and fell to the floor. He responded "Yeah, yeah," but then quickly stated he "was tackled."  *Id.*  Plaintiff went on to state, "I was falling backwards. He come running in. . . . And he had me, pretty much spun me in the air so I landed on my face.  And that was a wrap.  I mean, he took — grabbed ahold of me.  He was running the whole time. So he just kind of took – took control of me, man.  He put me to the ground face first really quick."  *Id.*  Plaintiff went on to say that he did not see the officer raise the Maglite to strike him, he did not see the Maglite as it came towards him, and his first awareness of being struck was when he was laying on the ground.  *Id* at PgID#307.

Defendant's recollection of events contrasts with that of the plaintiff.  Deputy Haskins testified in his deposition, that upon entering the home, he went immediately to the location where he had last seen the plaintiff, before plaintiff left his line of sight and retreated towards the back of the home.  Docket no. 30-7, Def. Dep. Trans., PgID#195-196.  Defendant identified that location as the area between the living room and kitchen, separated by an archway.  Deputy Haskins characterized his contact with the plaintiff as a "collision" right at the corner of the wall separating the two rooms, where they were "both going for the same real estate."  *Id.* at PgID#198-99.  He also

---

[1]Deputy Haskins was the lead officer.  *See* docket no. 30-5, PgID#184 (assigning Deputy Haskins as the lead officer for entry into the home).

stated he did not see the plaintiff before he collided with him.  *Id.* at PgID#200.  Deputy Haskins did

say he held his flashlight in his left hand, horizontally like he was holding a "bucket" by the handle

at chest level.  *Id.* at PgID#201. In an attempt to protect his gun with his right hand, he remembers

his left hand moving upwards. While he could not remember exactly where he made contact with

plaintiff's body, he thought it was somewhere around chest level.  *Id.*  On one critical point, Deputy

Haskins claimed he ordered plaintiff to the ground, that the plaintiff was not physically taken down

but was compliant with defendant's order, and was handcuffed.  *Id.* at PgID#202.

    The records also contain various factual inconsistencies regarding plaintiff's

complaint to officers about his alleged eye injury.  During the deposition, plaintiff testified that

while seated at the *kitchen* table after his arrest he told officers that he had been hit in the face, but

was told to "shut up."  Docket no. 33-2, Plt. Dep. Trans., PgID#313, pg. 107, lines 19-22 (emphasis

added).  When asked why he did not ask for medical attention at the jail, plaintiff replied, "[t]he way

I was treated when I was sitting on them handcuffs in my *living room*, when they had no concern,

when they told me to shut the F up. . . . They don't want to hear it, so I'm not going to sit here and

complain in a jail cell."  *Id.*, pg. 108, lines 3-5 (emphasis added).[2]  In response to Interrogatory 5,

which asked whether plaintiff complained to the jail staff, he stated, "I do not remember if anyone

at the jail asked what happened to my eye or whether I told anyone there what happened."  *Id.* at

PgID#314, pg. 111, lines 19-25.[3]

---

   [2]It was noted on the record that none of the officers involved in plaintiff's booking were the same
officers as on the scene during his arrest.

   [3]Plaintiff's testimony, that he does not remember whether or not he complained to jail staff, is
somewhat inconsistent with the claims in his Complaint.  The Complaint stated that while at home, he
"complained that his eye hurt where HASKINS had struck him, [but] unknown defendants told him to shut
the f - - - up," and that "[w]hile awaiting the arraignment, [plaintiff] complained to jail staff that his eye hurt
where HASKINS had struck him, but his complaints were ignored."  Docket no. 1, Plt. Comp. PgID#5.

Additionally, during his medical screening, plaintiff was asked if he had "any other medical problems [he felt] the [correctional facility] should know about." He stated "no", and signed the document. Docket no. 30-14, Med. Screening Form, PgID#249. While Plaintiff's wife testified she heard her husband tell her he had been hit in the face after he was handcuffed, every officer denied hearing Plaintiff complain he had been hit in face or was injured. Docket no. 30, Def. Brief PgID#140.

The record also contains disputes of fact regarding the nature and the cause of plaintiff's physical injuries allegedly caused by defendant. Despite plaintiff's claim that he "had a nice puffy, shined up eye instantly," booking photos taken nearly 90 minutes later do not clearly indicate such swelling. There was some evidence of discoloration, docket no. 30-15, Plt. Booking Photos, PgID#251, 253, but when compared to photos taken several years earlier, there was a similar red mark in the same general region of plaintiff's right eye. *See* docket no. 30-16 (police "wanted" poster with photos of plaintiff taken in 2006 or earlier). When plaintiff was asked to point out the injury in his booking photos from January 29, 2010, he pointed to a reddened area and stated, "that one really don't look like I remember it. But right there (indicating) looks a little more realistic. I remember it being -- I don't know. I guess it's -- it is what it is. But yeah, right there underneath the right eye (indicating)." Docket no. 33-2, Plt. Dep. Trans., PgID#313; Docket no. 30-16, PgID#255, 257. Plaintiff's wife testified that she observed a "black eye, shiner" when she picked him up after he was bonded out of jail by his mother. Docket no. 33-3, Dep. Trans. of Anne Zuhl, PgID#336.

Plaintiff eventually sought medical attention from RX Optical on February 4, 2011, six days after his release from custody. The attending physician observed that plaintiff's eyelid was bruised and swollen and noted "ocular trauma." Docket no. 1, Plt. Compl., PgID#5. Plaintiff was

prescribed eye medication during this visit.  Photos submitted as part of the record by the plaintiff, which show more extensive bruising, were taken sometime after this appointment, as evidenced plaintiff's dilated pupils (caused by the eye medication prescribed at the February 4, 2011 appointment), which was confirmed by plaintiff.  Docket no. 33-2, Plt. Dep. Trans., PgID#316.

Plaintiff stated he was also treated by his regular ophthalmologist on February 8, 2011 at Great Lakes Eye Care (GLEC), ten days after the incident, and was "diagnosed as suffering a corneal ulcer[4] on his right eye and was instructed to not return to work for another one to two weeks."  Docket no. 1, Plt. Compl., PgID#6.  At this second appointment, plaintiff testified that the history he provided to his doctor included a statement that he had worn his contacts for about four or five days before the alleged incident at issue and did not remove them until two days afterwards. Docket no. 33-2, Plt. Dep. Trans., PgID#318-19. The referenced report also stated plaintiff "sometimes slept in contacts."  *Id.*

On September 20, 2010, plaintiff saw a specialist who recommended a cornea transplant to "fix his [right] eye."  *Id.* at PgID#323.  However, the surgery was never performed. Plaintiff's insurance would not pay for the procedure because plaintiff sustained his injury during the commission of a felony and the plaintiff could not pay for it out of pocket due to its cost.  *Id.*

---

[4]*See* http://www.webmd.com/eye-health/corneal-ulcer. ("Most corneal ulcers are caused by infections. . . People who wear contact lenses are at an increased risk of corneal ulcers. In fact, your risk of corneal ulcerations increases tenfold when using extended-wear (overnight) soft contact lenses.  Extended-wear contact lenses are those contact lenses that are worn for several days without removing them at night.  Contact lenses can damage your cornea in many ways. Scratches on the edge of your contact lens can scrape the cornea's surface and make it more open to bacterial infections.  Similarly, tiny particles of dirt trapped underneath the contact lens can scratch the cornea.  Bacteria may be on the lens or in your cleaning solutions and, thus, get trapped on the undersurface of the lens.  If your lenses are left in your eyes for long periods of time, these bacteria can multiply and cause damage to the cornea.  Wearing lenses for extended periods of time can also block oxygen to the cornea, making it more susceptible to infections.")

Based on these facts and plaintiff's previous medical history regarding his right eye,[5] there is a causal question as to what caused the eye injury for which plaintiff seeks damages.

## III.    Discussion

### A.    Plaintiff's Excessive Use of Force Claim

The use of excessive force by law enforcement officials in making an arrest may give rise to a claim under 42 U.S.C. § 1983 for a violation of the Fourth Amendment.  *See Bass v. Robinson*, 167 F.3d 1041, 1045 (6th Cir. 1999).  "In addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force."  *Graham v. Connor*, 490 U.S. 386, 394 (1989).  "[I]f the plaintiff was a free person at the time of the incident and the use of force occurred in the course of an arrest or other seizure of the plaintiff, the plaintiff's claim is governed by the Fourth Amendment's reasonableness standard."  *Aldini v. Johnson*, 609 F.3d 858, 865 (6th Cir. 2010).  *See also Gaddis ex rel. Gaddis v. Redford Township*, 364 F.3d 763, 772 (6th Cir. 2004) (citing *Graham*) ("[t]he sole constitutional standard for evaluating excessive force claims is the Fourth Amendment's criterion of reasonableness").

---

[5]When deposed, a significant amount of plaintiff's medical history for his right eye was revealed. Due to genetics, plaintiff is color blind. Docket no. 33-2, PgID#309, pg. 89, lines 1, 4. A medical report dated May 26, 2006, completed by Dr. Robert Flood, stated that plaintiff slept in contacts three to four nights a week and listed "blurry vision" as plaintiff's chief complaint. *Id.* at PgId#296. On October 10, 2006, while in police custody, plaintiff was taken to GLEC for acute eye care due to complaints of severe pain, sensitivity to light, and blurry vision. *Id.* at PgID#294. On October 23, 2006, plaintiff again visited GLEC complaining of pain and discharge. The medical record stated that plaintiff believed his contacts were the cause of his condition in his right eye. *Id.* at PgID#295. On November 20, 2006, plaintiff was diagnosed with Keratitis, an irritation of the eye, in his right eye. *Id.* Additionally, plaintiff visited an eye doctor on September 8, 2011, after a "chunk of steel" from a grinder hit his right eye while at work. *Id.* at PgID#320.  This occurred after plaintiff was allegedly struck with a flashlight by Deputy Haskins.

Whether an officer has used excessive force in effecting an arrest depends on whether the officer's conduct is "objectively reasonable" in light of the facts and circumstances surrounding the arrest. *See Graham*, 490 U.S. at 396-97. "Courts must apply an objective standard, looking to the facts and circumstances of each particular case, including [1] the severity of the crime at issue, [2] whether the suspect pose[d] an immediate threat to the safety of the officers or others, and [3] whether he was actively resisting arrest or attempting to evade arrest by flight." *Gaddis*, 364 F.3d at 772 (citing *Graham*) (internal quotation marks omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments–in circumstances that are tense, uncertain, and rapidly evolving–about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396-97. Whether a particular use of force was reasonable "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Id.* at 396. The extent of the injury is not a crucial factor in determining an excessive force claim under the Fourth Amendment. *See Bass*, 167 F.3d at 1046 n.1 ("[a] factor that is not crucial to an analysis of a claim for excessive force in violation of the Fourth Amendment is the extent of the injury inflicted").

Viewing the allegations in the light most favorable to the plaintiff, the court concludes there are factual disputes at issue which preclude granting a motion for summary judgment. At a minimum these include: (1) When did the arrest/seizure in this incidence occur? (2) Was excessive force used? (3) What was the cause of injury to plaintiff's right eye? There were genuine issues of material fact crucial to a resolution of this case from the moment the officers broke open plaintiff's front door. Plaintiff was not the target of any arrest warrant, nor even the cause for the search warrant the police were executing during their raid that early January morning in 2010,

9

only an innocent occupant of his home.  Apparently the police were investigating whether plaintiff's wife was selling cocaine out of a bar where she worked.  There was no suggestion plaintiff or his wife were violent people.  And plaintiff's only conduct the police observed that morning, once they entered his home, or that he in fact ever committed, was that he changed the direction he was moving.  Yet within barely moments he had been struck by or collided with Detective Haskins, and was on the floor (either because he had been tackled or had gotten down on the floor in response to a command), handcuffed with an alleged injury to his eye.  He remained in custody until he was subsequently bonded out of jail at the police station.

Certainly the police cannot use excessive force during the course of making an arrest or other police seizure, and this, as stated above, is determined by a standard of reasonableness. *Aldini v. Johnson, supra.*  This in turn requires the court to examine the facts and circumstances of this particular incident.  *Gaddis v. Redford Township, supra.*  When did the arrest occur and how much force was used?  There is simply no agreement on any of the determinative facts surrounding when or how plaintiff was seized here, e.g., whether plaintiff surrendered voluntarily after an accidental collusion or was intentionally struck and thrown to the floor before he was handcuffed.  Also, did defendant strike plaintiff with his Maglite, and if so, was it accidental?  There could be no justification under any set of facts in this case for an intentional striking.  And did such a striking injure plaintiff's eye, and if so, to what extent?   Or were plaintiff's eye difficulties caused by outside problems?

Defendant's motion for summary judgment will be denied on the merits.

### B. Qualified Immunity

In the alternative, Deputy Haskins contends that he is entitled to summary judgment based on qualified immunity on Count I.  Government officials have qualified immunity under § 1983 for damages arising from the performance of their official duties if "their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  Consequently, the doctrine of qualified immunity protects "all but the plainly incompetent or those who knowingly violate the law." *Malley v. Briggs*, 475 U.S. 335, 341 (1986).  "[A] defendant is entitled to qualified immunity on summary judgment unless the facts, when viewed in the light most favorable to the plaintiff, would permit a reasonable juror to find that: (1) the defendant violated a constitutional right; and (2) the right was clearly established." *Bishop v. Hackel*, -- F.3d --, 2011 WL 191951 at *4 (6th Cir. Feb. 1, 2011), citing *Pearson v. Callahan*, 555 U.S. 223, 232 (2009).  The court may exercise its discretion to decide which prong of the test to address first in light of the circumstances of the case.  *Id.*

> When, as here, a defendant raises qualified immunity as a defense, the plaintiff bears the burden of demonstrating that the defendant is not entitled to qualified immunity. The plaintiff has the burden of showing that a right is clearly established.  However, the defendant carries the burden of showing that the challenged act was objectively reasonable in light of the law existing at the time. While the facts are normally taken as alleged by the plaintiff, facts that absolutely contradict the record will not be considered as claimed by the plaintiff.

*Everson v. Leis*, 556 F.3d 484, 494 (6th Cir. 2009) (internal citations omitted).

Plaintiff claims that Deputy Haskins violated his Fourth Amendment rights through the use of excessive force.  The right not to be tackled, struck in the face with a Maglite and thrown to the ground and handcuffed in one's home, by an invading policeman, when one has done nothing, and is not even the target of the warrant, and is trying to surrender to the policeman's will, could not

11

be plainer.  The police-state type behavior alleged in the Complaint, supported by plaintiff's testimony, is unquestionably prohibited by the Fourth Amendment.  This being so, the officer's refutation of these allegations raises, as a practical matter in this "he-said, she said" context, the same genuine issues of fact that must be decided to resolve plaintiff's claim in the first place.

Accordingly, Deputy Haskins cannot be granted qualified immunity on this record.

## IV.  Conclusion

Defendant Haskins' motion for summary judgment on Count I (docket no. 29) will be **DENIED**.  An Order consistent with this Opinion shall be issued forthwith.


Dated:  September 11, 2014                     /s/ Hugh W. Brenneman, Jr.
                                               HUGH W. BRENNEMAN, JR.
                                               United States Magistrate Judge